All rise. The United States Court of Appeals for the Ninth Circuit is now in session. Please be seated. Good morning and welcome to the Richard H. Chambers U.S. Court of Appeals Courthouse here in Pasadena. Welcome all of you. This is the time set for the case of United States of America v. Gerardo Farias-Contreras. So if the parties are ready to proceed, you may come forward. Thank you, Your Honor. May it please the court, counsel, and the key. This court has a very clear legal principle, and that is the government may not superficially abide by its terms or promise to recommend a particular sentence while doing so making statements that serve no practical purpose but to advocate for a harsher sentence. And in this case, it's clear that the government violated that principle and that clear principle that's been laid down by this court since Heredia, Whitney, Mondragon, and Johnson. That's what let's assume, Armando, that prong one of the plain error review is met. What's your best argument that this was plain error given the very mixed state of the law on that issue? So the way I see it is that there is no real mixed law in this area. In fact, I believe Mischella makes it, the law in this circuit, absolutely clear. And what I mean by that is that Mischella was a case that had, as the dissent pointed out, Judge Bennett, had similar components in this case. One is that the government had to recommend no more than a low end of a sentence. The government could supplement the facts. The defendant could argue for a lesser sentence. The only distinction in Mischella is there was a specific term in that plea agreement that allowed the government to argue against or oppose the downward variance. There is no such provision in this case. And I think that's important because what Mischella says is that in distinguishing Whitney and in distinguishing Mondragon and in distinguishing the first circuit case, Canada, they said that the differences of the government's arguments in Mischella at sentencing were directed to the specific objective identified in and permitted by the plea agreement. But, counsel, you were arguing for something less than the sentence. The government was required not to recommend more than, right? That is correct. And the plea agreement says the statement of facts in the plea agreement does not preclude either party from presenting and arguing for sentencing purposes additional facts which are relevant to the guideline computation or sentencing unless prohibited in this plea agreement. Is there anything in the plea agreement that prohibited the government from arguing facts relevant to sentencing to counter the argument that you were making about your client should get a sentence way under the guidelines? Yes. What provision? Excuse me. Sorry. The low-end recommendation. From the Supreme Court through this court case. Wait a minute. Did you say the low-end recommendation? Yes. That prohibited the government from responding? You have to. Well, excuse me. These plea agreements are to be read as a whole, not in isolation. But as a whole, what Judge Bennett's positing is there was this deal, right? And you all came in. I don't know if it was you or not. But anyway, defense came in and argued for a greater leniency. So why is it impermissible for the government to respond to that? Providing they stuck to the deal, of course. They still have to make the recommendation. I'll explain that. But even you viewing it as a whole, I think I'm missing your answer to Judge Bennett's question. So long as their answers or their facts don't undercut their duty under the plea agreement to argue a sentence not in excess of the guidelines, that violates this plea agreement. It violates the law. If the facts that are being included in the government's memorandum undercut the low-end recommendation, the best example. They're relevant to sentencing. Even if they are relevant to the exact argument, even if they're relevant to countering the argument that you're making, which is not, should get 151 months, but should get something materially less than that, that they are prohibited from telling the judge facts that would counter your argument. Yes, because the government's arguments have to be directed to the specific objective identified in and permitted in the plea agreement. And what's identified in this plea agreement is the promise by the government not to recommend a sentence in excess of the low-end. And so when you identify the objective of the plea agreement. Excuse me, Your Honor. Did the government do that? Yes. They included inflammatory arguments, additional information that had nothing to do with this particular case. And as the case law says, in an effort to, or to have no purpose, no practical purpose, other than to ask for a harsher sentence. Just give us one example. For example, do you mean the case, is it out of the Fifth Circuit, referring to that case? So let's use that as an example. That is an example. So that would take us back to Judge Smith's question. Because he posited, let's assume that there was an error here, that the government stepped across the line in some instance. So why was that plain? There wasn't an objection anywhere that I can see in the transcript. Is that right? Well, the government's obligation under this plea agreement is plain. Wait a minute, wait a minute. So we're positing there's an error. Let's say one of these sentences in the transcript goes across the line. I'm just positing that as a hypothetical. There wasn't an objection, right? So you're going to have to show us plain error, isn't that right? That's true. Okay. Yes. So what's your best shot? The best shot is United States v. Puckett when they outline what it means to be plain under a plea agreement. Because the Supreme Court recognizes that breach cases have some bite. And what the Supreme Court indicates is, I'll get to the direct quote. Of course the second prong of plain error review also will have often some bite in the plea agreement cases. Not all breaches will be clear or obvious. Plea agreements are not always models of draftsmanship, so the scope of the government's commitments will on occasion be open to doubt. There's no doubt in this plea agreement what the government's commitment was. It is clear that the government was committed to not recommend a sentence in excess of the low end of the value. So when the defendant asks for a lower sentence, what could the government say in response to that? What are the kinds of things that you think would be permissible for the government to invoke to rebut that? That's a good question because there was no term in this plea agreement that allowed the government to. I'm getting it. This is your position. They could say nothing. No. My position is it has to be a fair response. And a fair response is not an exaggerate or including inflammatory language. Can you speak in front of the microphone, please? It even goes against the low-end recommendation. So there are. What would be a fair response? What were the kind of things that you think the government in this situation could have come forward with? We believe the defendant's recommendation is too low because the low end fulfills the goals of sentencing just like they did in Michelle. So if the government had simply referenced the defendant's requested downward departure in talking to the court about why they disagreed and had said the defendant's request for a downward departure isn't appropriate for these reasons, and therefore that's why we are requesting the 151 months, which is the agreed upon lower end of the range, that would be okay. Because they're both referencing the fact that they're responding to the requested downward departure and also reiterating the sentence that they are bound by the plea agreement to recommend. As long as their response is not reasonably understood or reasonably interpreted as asking for a sentence harsher than the low end. Why is that just a plain yes? It seems to me that by referencing the downward departure that the defendant is seeking specifically in responding to the question and then reiterating the sentence that the plea agreement requires them to make, that sort of resolves the other issues that you're talking about and it would be a fair response. Isn't the answer to my question a simple yes? I don't believe so because is it fair to allow them to respond to the lower sentence request without a term in the plea agreement? Yes, it is fair, but it has to be a fair response. And Michelle, it was a fair response because the arguments were directed to the specific objectives that were identified in and permitted in the plea agreement. In this case, and I believe that's a critical point in this case, is that the remarks made by the U.S. Attorney in the memorandum, Assistant U.S. Attorney in the memorandum and at sentencing, were not directed at the specific objective identified in the plea agreement or permitted in the plea agreement. So, I understand your answer to be something like, it's not actually reasonable to say we're arguing for the low end of the guidelines by saying that he's worse than a mass murderer. So, I mean, I think that's your point, right? Yes. But if that's true and that's your argument, what if Michelle had told us that? Like, I'm really having trouble understanding how we wouldn't be articulating a new rule by saying that today. We're not articulating a new rule because the new rule is based on the legal principle at play, not the specific facts. In fact, the Supreme Court in Santa Bella said the circumstances are going to vary. But the one thing that doesn't vary whatsoever is that when the government makes a promise that induces a defendant to take a plea agreement, that promise must be fulfilled. So, the circumstances will vary, but the legal principle is never going to vary. This court for 25 years has carved out the legal principles that apply in these situations, and it's the legal principle that's at play, not the varying facts. So, the legal principle is that the government cannot undercut its duties under a clear provision of the plea agreement to include inflammatory language, inflammatory facts, facts in addition to. In fact, in this case, the government deliberately used facts that were not in addition to. So, on that point, your friend who's going to be arguing in a couple of minutes says, of their brief, a prosecutor cannot bring up aggravating information that the court already has before it, saying that they believe the rule here is that if there is a fact that the court already knows, presumably in the pre-sentence report or the plea agreement, the prosecutor is not allowed to even mention it. I mean, that's literally what they say in their brief. Do you agree with that? That's what Monaghan says, and that's what U.S. Reid-Whitney says. And I believe. The only thing the prosecutor. So, the prosecutor can't repeat anything that's in the plea agreement as a fact, and can't repeat anything in the pre-sentence report in talking to the judge. If they direct it to a specific objective identified in and permitted by the plea agreement. So, in other words, Mr. Farias Contreras has a criminal history that goes all the way back to the 90s, and massive amounts of drugs being moved through the United States from 2008. However, his physical conditions and the reasons that we came into this plea agreement were recommending the low end of the guideline range. I don't see a problem with that. But when you don't argue, when your argument is not directed to the objective of the plea agreement, and that's specified in the plea agreement, and what's permitted by the plea agreement. I find it remarkable that, I guess it's Amicus that's made this argument, that the government can't refer to what's in the PSR. I mean, the court sees it. The court knows what's in there. If the government said nothing, it would already be aware, but it could evaluate it in the sentence. And I look at Whitney, I look at Arabia, I find them very distinguishable from here. I look at Moshella, and that doesn't help you that much, I don't think. Which is why I get back to my original point. This law, perhaps, is not very clear. You want to make it clearer. But if that's the case, then how is the second prong of plain error review satisfied? By looking at the specific term of the plea agreement. I mean, in the law. If the law is not clear, you're arguing to make it so that the government can't say anything that's in the record. You've got to just say, you know, we pretty think it's a great deal. I'm not conceding the law isn't clear. I'm saying that the varying facts that apply to the principles of law that are clearly set out in 25 years of jurisprudence from this court. What cases do you cite that you believe already make this point clear? Respectfully, your amicus is telling us what he thinks it ought to be. But I don't see that in the existing law. So what am I missing? Where's the case of cases that says what amicus is arguing for? Whitney, it's 673-5-3 at 971. When the government obligates itself to make a recommendation at the low end of the guideline range, it may not introduce information that serves no purpose but to influence the court to give a higher sentence. This prohibition, yes, this prohibition precludes referring to information that the court already has before it, including statements related to the seriousness of the defendant's prior record. Two, statements indicating preference for a harsher sentence. Three, or introduction of evidence that is irrelevant to any matter the government is permitted to argue. And in this case, what the government is permitted to argue is for a low-end sentence, no sentence in excess of. So what I've done in looking at this, I have looked at it as though that term in the plea agreement didn't exist, that the government was allowed to ask for whatever sentence they wanted to. And looking at the government's argument, the government's arguments are tailored towards giving Mr. Ferencz Contreras the highest sentence the judge could possibly give him, including analogizing his conduct to a small-time dealer in the Fifth Circuit case that got a life sentence, putting him at the top of the chain, putting him at the top of culpability, saying to the judge at the sentencing hearing, there's nothing that will stop him from going back to this role in the future, saying to the court that we've discussed this matter extensively in our office, and we all came out to the same conclusion, that a significant sentence was needed for public safety and for the safety of the community. Thank you. Thank you. Mr. Bronco. Good morning. Vince Bronco, Federal Defenders, on behalf of the AMICI, the Federal and Community Defenders throughout the Ninth Circuit. I'd like to first address the question of what is the best case. I think the three best cases that show are Whitney, Mondragon, and Johnson, and they all stand for this premise that the government has to be careful when it's responding to defense arguments. I want to hear what you say about these cases, but would you address the concept that Whitney is factually distinct from this case? And if you don't feel that way, why is it binding on us in this situation? The legal rule, well, obviously this is an en banc court, but the legal rule that's critical in Whitney is the government can't superficially abide by its promise, but then provide information that contradicts that, and even in a response. And Whitney is a response case. In that case, there was a dispute as to a leadership enhancement, and it was in that context that defense counsel had said, he's not a good thief. The prosecutor then came on and said, yes, he is a good thief, and in that context provided a whole bunch of information from the PSR. It was that context of how it was not a proper response is what constitutes the breach. Just saying low end at that point was superficial. But the defendant there wasn't arguing for a lower sentence than had been agreed? Functionally, yes, because the defendant was allowed to argue against certain enhancements, and the government was allowed to argue for certain enhancements, and one of the key ones was leadership. So there was a dispute as to the sentence. Although they both agreed to recommend low end, it was a disputed sentencing case. Well, here the government agreed not to recommend a sentence higher. It didn't agree that it would recommend the low end, right? Certainly, the government could have recommended lower than the low end. But if the government agrees not to recommend a sentence in excess of the low end guideline range, as they calculated, the defendant may recommend any legal sentence, and the statement of facts does not preclude either party from presenting or arguing for sentencing purposes additional facts relevant to sentencing. So do those three things together mean that the government can't marshal facts in opposition to the defendant's argument he should get much lower than the guideline range? I would say the prosecutor can marshal facts to go against a specific argument made. And in this case, what the broad principle is here, the government can't use this provide information clause as a way to get around its low recommendation clause. Meaning they can't just say, oh, we're allowed to provide information, so we're going to provide whatever. It's allowed to provide facts. Well, a lot of what the government provided here weren't really facts. They were quotes from a dream book saying how drug addicts shape shift. They were quotes from a Fifth Circuit case that weren't facts in this case, talking about how drug dealers are worse than murderers and are more like vampires, but these weren't facts that the government was presenting. Your brief says they can't even present facts if the court already knows them. Your brief at pages 9 and 10 says they are prohibited from giving the judge facts that the judge already has. I think that can be read in context, and if this is an en banc court, to at least make some clarification on that, of you can provide facts in a specific argument against, meaning if the government is indeed saying, look, the defense is arguing for this lower sentence, these facts in the PSR counsel, you shouldn't go down as low as that, or if they changed it around some and said that our recommendation is 51 months, and you shouldn't go lower than that because, and mention some facts, but that's the problem here. There is absolutely no context to the government's arguments. They just said in their sentencing memorandum 151 months at low end and then argued or presented a bunch of information and some facts that just basically recommended a recommendation that would be the high end or even above. Why do we think that? I mean, the facts that they presented, and I think the USA said at one point that a long period of incarceration is necessary, right? But 151 months is a long period of incarceration, right? So, I mean, it depends on what you're comparing it to, right? I mean, 151 months is lower than high end of the guidelines, but it's higher than what he was asking for. So I guess you seem to be inferring from the fact that they presented evidence that would justify a long sentence that they must have meant higher than what they agreed to rather than simply higher than what he was asking for. And why should we draw that inference? Because context matters when there's a low end recommendation on a scale of a guideline scale. That is the government saying that we're going to recommend the low end, which necessarily involves some mitigating, maybe getting facts within this range, meaning if the government agreed to recommend the high end or any sentence within, maybe they have more leeway to bring up some of the negative facts. But the point here is they are telling the court what we bargained for. I'm not sure if that really makes sense in an advisory guidelines regime where the court is free to go above or below the guidelines based on its assessment of the 3553 factors, right? So when the defendant is there saying defense is not that serious, my personal characteristics are a basis for a lower sentence, why isn't the government able, one way to respond to that is to say, no, indeed, the offense is very serious. So you should not accept the recommendation of the defendant. I've been practicing in district courts and appellate courts for over 28 years, pre-booker, post-booker, and a low end recommendation really means something to judges in the district court. They generally sentence at or below what the government recommends. And just in general as to statistics, the charts that the government has provided, what they didn't provide in there, but if you go look at it, that the court varies below a government recommendation only in about 13% of the time throughout the Ninth Circuit, and I think it's about 18% in the Eastern District of Washington. So it's not this free for all, post-booker. The guideline, generally judges sentence within the guideline range or they go lower because of a government motion to go lower. It's not what we're looking for. Is the defendant entitled to go outside the record to try to influence the judge to lower the sentence below the guidelines? I'm not sure. In this case, Mr. Farias-Contreras, could he have come up with a whole bunch of things that were not in the PSR or in the plea agreement and cited those to the judge as reasons for his lowering the sentence? Of course, as long as they're related to the 3553A factors budget. The bargain he struck with the government permitted him to do that. The government knew that going in that he could present any argument he wanted. Is that because of what's in the plea agreement? Yes, the plea agreement allowed him to argue for variances in budgets. Okay. And did it not allow the government to respond? It did not allow the government to respond in a way that contradicted its low-end recommendation. But that's not the purpose, right? It's not the purpose. It's not about the specific facts the government was allowed to speak or not speak that are in the PSR or not. It's the purpose for which the government is invoking those provisions, right? Yes. I'm sorry. So it just seems to me to be, when I read this transcript, that one thing that's happening, and maybe you think I'm reading too much into it, so I'd appreciate that feedback, but it seems to me the judge is effectively raising his eyebrow because there's this really serious conduct over a very extended period of time. And the prosecutor is responding in part to say, we've looked at it. We've sort of huddled in-house. We recognize this is very serious conduct. We also recognize he's got this disability. So in other words, the purpose, part of what the prosecutor is doing, and I think it's incumbent upon the prosecutor to do, is to defend the recommendation. Is that a fair read? It's sort of a follow-up of what Judge Miller is asking. Why isn't that a fair inference? I don't think it's fair. That's not the inference that the original panel took, and I don't think it's a fair inference on this. I think it's outlawed now. Yeah. And I think there are some, I was referring to the comment about the huddling in the office, right? There's other comments in the record that seem to me to be, I am one out of 11 here, but there are other comments in the record that seem to me to be significantly more cringeworthy. That's my word. But there wasn't an objection, and so it comes all the way back to what takes us across, for me it does, what takes us across the line to plain error? Going on part of the things is, even if you just look at the conduct or what the judge at the sentencing was saying, one of the problematic parts of this is that the government had already filed its sentencing memorandum, which had all this what I think is just irrelevant and prejudicial information about the DreamWorks. I understand you. I don't mean to interrupt, but your position is some of these comments that I've postulated as cringeworthy on my scorecard were affirmative, that the government led with them? Yes. In response to what I'm seeing in the transcript, was the judge looking to the government to say why is this a good idea? Correct. They led with, I mean, if you look at their sentencing memorandum, they say we recommend the low end and then went for pages on reasons to go high end or above would not be mitigating. At that point, did the government, if I put all of the record in chronological order at that point, did the defendant make plain that was also kind of requesting something below the low end? Yes. At the point of the, my understanding of the record is the defendant had made a sentencing memorandum with a six-level departure request, and the government came back at a three-level departure request. That's my understanding, too, so why isn't the government still responding? What I thought you responded to my question with a minute ago was that I should find these, the cringeworthy comments, if there are some, to have been impermissible because the government led with them. My notes, correct me if I've got it wrong, are that the chronology is such that the government was indeed responding. Is that wrong? They were, at that point, responding to a six-level request for a departure, but their low end and the information they're providing about this are directed to where that, where the sentencing should fall within the range. They weren't directed to should this be a six-level or three-level departure. They were providing pretty much 3553A factors that. Counsel, why are the facts from DREAMM not relevant to requesting the almost 13-year sentence? That's a very significant sentence. And so, laying out why drug trafficking is very dangerous, why is that not relevant to seeking 13 years in prison? Maybe some would have been relevant, and maybe some, if you made the context, well, I don't think it's relevant to cite a Fifth Circuit case that is upholding a life sentence for a low-level drug dealer and then quoting from it and making the comparison that drug dealers are worse than murderers and more like vampires. That is completely irrelevant. That doesn't mean they're seeking 13 years, which is not a small number. That's a very, very big number, so you have to explain why you're seeking that big number. Exactly. But the guidelines account for the big number already. The guidelines were at a certain level. I think that's a good way to comment. That's one of the comments. That's one of the things that the guidelines asserted, which you think goes across the line. This does more than defend the deal, the 151 months, and you think that it goes across the line, and I think you have to show why that's plain error. That's plain error because the practical purpose, that's the court's rule. I would think that the government has suggested other circuits, but you look at the overall conduct. Is it reasonably consistent with making the promise recommendation, or is it more consistent with undermining that recommendation and providing, in this context, providing all that information was undermining the recommendation? I think what you're saying, I just want to get this, put a bow on it, right? What you're saying is that you feel like some of the comments that were extreme, and you've identified one right now, were so extreme. In fact, I would really like to know why the defendant, the appellant in this case, appealed before an en bas court. What portion of our law did you feel was not clear that you wanted to have clarified? When you come back, tell us that, okay? Okay, so on my rebuttal, yes. How about if I just fix that? Yeah, you've got it, yes. I think what you're saying is that you've identified an example that's really extreme, a comment that you find extreme, it's the Fifth Circuit case, and invoking it, and that we should infer that it is extreme enough that the purpose was to undo the deal. That is to influence the judge to give a higher sentence than the low end of the equation? Yes, yes, yes. I'm agreeing. Mr. Robbins, before you sit down, so if there had not been the reference to the book in the Fifth Circuit case, do you think the government still breached the plea agreement? Yes. I think there's like three by character, three kind of forms of conduct here. That is one. And in the way that they were in the sentencing memorandum and at sentencing, saying that Mr. Farias was at the top of culpability, that is implying not just this. In this range, it should be the low culpability, but they kept insisting that he was the top culpability and supporting that with information from the PSR. And then finally, the comments about how this had been a much discussion. And I think the reasonable reading of that discussion is that the prosecutors did not agree about how low this sentence was, and that's what the debate was, that no one within the prosecutor's office there was suggesting this sentence should be lower than our recommendation. There's disagreement as to how low that the recommendation was. My time is way up, but I'll answer any questions. Do you have a question? Okay. Your time is up. Okay. Good morning, Your Honors. Scott Meisler from the Department of Justice on behalf of the United States. We are asking the Court to hold at Prom 1 that there was no error, but at a minimum that the error was not plain and not prejudicial. I'm hoping to cover on the question of breach of error first what the legal rule we're proposing, because the Court is sitting en banc, and then turn to some of the factual matters that you've been addressing with opposing counsel. And I do want to return to Judge Christian's point about the proper inference just to be drawn from the record, because in case I don't get back to that, that is the proper inference to be drawn from the record. But the legal rule we're asking, Your Honors, the one that's set forth on page 7 of our en banc supplemental brief, we think the key circumstance here and the way that this Court can reconcile a decision here with its prior cases without overruling any of them, is to recognize that this is an instance in which the plea agreement allowed the defendant to request a sentence below the one the government had promised to recommend and did not prohibit the government from responding to that. Moshella, in some ways, may be an easier case for us, for the government, because you have a specific clause in that, but that just raises the question of what is the default rule in these circumstances. We've looked to the First Circuit case law, including the Lessard case we've block quoted here. The Tenth Circuit has the same rule. I'm not aware of any circuit that has a rule saying that the default in those situations is the government must stand silent. So the block quote or the quotation that Mr. Harmel understandably read from Whitney has some strong language in it, but that's why it's important to recognize what was going on in Whitney, what was going on in the prior cases, and that they were either by their terms or in principle joint recommendation cases. So in your view, there's no limit on what a government can say under those circumstances, just nothing at all? No, but that's not what I'm trying to say, Your Honor. I'd appreciate the chance to clarify that. I do think we tried to say in our brief some version of what Mr. Ponca just said, like what the First Circuit uses. Taking into totality, was the government's conduct, was its arguments reasonably construed as supporting the argument or being or fatally undermining it? But I think that has to be a lenient standard in these kind of cases, and I think on plain error even more so. Let me just ask you the question because I understand everything that's being discussed here, but it seems like in formulating the recommendation that the defendant made, I mean the lawyer made on his behalf, they focused primarily on the extreme health issues and physical limitation. I think that included partial paralysis resulting from a gunshot wound. And it just seems that the response from the government, instead of responding to that, they came at it with a sledgehammer in terms of referring to the vampire and all these things. It just is not fair here, and doesn't that, I guess, constitute an end run around, and I understand the provide information provision there, but is that an end run around the agreement not to recommend above the low end? I don't think it is here, and I would agree with Your Honor that, and I think this is maybe some of Judge Desai's questions on this as well. If the government, just like before this court, if you had an answer in brief that doesn't say, contrary to defendant's contention, doesn't signpost, is the word I would use, doesn't signal that you're being responsive, some message may get lost, and that makes this a harder case for us. If the prosecutor had said those things, I think this would be a much easier case, and the panel's reaction to it may have been different. So those, I think, are kind of sufficient criteria and sufficient guidance you can give, but I don't think it's necessary. By making these arguments, since we are poking our finger at one that seems to be particularly cringeworthy, by making those arguments, doesn't the government expose itself? If the defense counsel had objected, this would be a very different argument. I think that's right. I think you're right, Your Honor. I think some of these remarks, I think, are, I should say, I think the sentencing memo is, I don't actually think the prosecutor did anything wrong here, and the sentencing memo is close to the line. I would acknowledge that. But I do think the plain error rule serves a really important purpose in this context, and the Supreme Court made that clear at Puckett. If you remember, many lower courts before Puckett declined to apply plain error. They just said it doesn't do any work in this context. So part of the work and the explanation the Supreme Court did in Puckett was to walk through why each of the factors in the plain error test matter in this context, and one of those was to try to induce timely objections. And I think, if I can just jump ahead for one second, the Gansey case from the First Circuit cited by both the federal defenders and Mr. Hormel, I think is kind of exhibit A for what happens when a defendant objects. That's a case that bears, I think, some similarities here. But what happened was the prosecutor was going on and on. The district court interjected on objection, and it made a finding that no reasonable observer hearing the prosecutor's argument would think that she was supporting the low-end sentence she promised to recommend. It was a finding from the district court making an on-the-spot assessment of what seemed obvious. You don't have that here. And so I think part of the problem is appellate courts are always going to be reviewing cold records, and if no facts are found, no one's making a finding about tone and depth as this court, as the words the court used in Heredia. I think that weakens the appellate review process. I think the plain error problem, too, should do work here. The court should make clear it is important to object. If counsel thinks it's borderline, bring that to the district court's attention. The record will be fleshed out, and to their advantage, the courts still apply an automatic reversal rule. This court on numerous occasions has said, well, the district court didn't find a breach. We disagree. The judge said, in any event, I wasn't influenced by that, but under Santabello, that doesn't matter. It goes back anyway. So I think the court should make clear here on the problem-to-analysis, it does have to be clear. If defense counsel thinks it's unclear, they should object, and it's going to benefit them either at the time or later on when it comes to appellate review. So I do acknowledge, Judge Christian, some of the comments here. I'm not sure I would use cringe-worthy. That's your honor, sir. What word would you use? I'm not trying to be cute, but I do want to know. Hindsight's always 20-20. But I do want to be clear. Your responses have been helpful to me. I just want to be clear about whether or not the government's position is that this was all in bounds. Are you defending all the representations made by the government? I understand you're a lot more comfortable talking about plain error review. No, no, absolutely. But even in retrospect, Judge Markey has asked the same question. Are these all in bounds? I think they were all in bounds, but I would view the Dreamland and the statistics as closer to the line. So I would say they were probably ill-advised, and in retrospect, I think they may have been unnecessary. Because, again, you don't know. The prosecutor didn't know this at the time she put fingers to keyboard or pen to paper on the sentence memo. But it's clear that the judge, having reviewed the PSR thoroughly, had a certain reaction to this case. And so, if I could jump ahead, two kind of reasonable inferences to be drawn from the record. Some of this is in the sealed materials, so I don't want to tread on that. But I do want to address the point about much discussion in the office. I think that, to my mind, colored the way the three-judge panel viewed this case. And I do not think it's fair, as Mr. Branca said, he doesn't have the benefit, maybe, of some of these materials. I don't think it's fair to read that at all as simply dissension in the office. And we know that not just from something I'm telling you. But in the record, 10 pages ahead of, I think this is about ER 6768, as Judge Christian pointed out, the district court came in with an eyebrow raised, skeptical of the government's guidelines calculation. The plea agreement was key to low-end as calculated by the government. So the court came in skeptical of that. And how did the prosecutor respond? She responded by assuring the judge that there was much discussion in the office, and the government stood behind. That was the word she used, stood behind its recommendation. Ultimately, the judge agreed with that. And he calculated the guidelines lower in the way the government had recommended. So 10 pages later, again, I think that comment was, I would say, it was biased in retrospect. It was off the cuff. But it's quite clear to me in context that the government attorney was using that reference to support, not to undermine, the government's recommendation. And just to be clear, given some of the arguments about what I think from Mr. Hormel about what would be in bounds, I think the government was doing a basic. I think there's one way to read that to say that the dissension inside the office, the U.S. Attorney's office, was that the government should actually go lower than low-end. Is that a proper way to read it, or do you think that's a wrong inference? I think the idea was exactly what Judge Christian said earlier, that the government was trying to do the balancing itself. And I think there's some terms in the way the prosecutor said it. Would they be balancing upward from 51 or lower from 51? Because it seems like they might be considering the handicap or the physical disability and thinking lower than 51 might have been appropriate. Without getting into what the deliberations were, Your Honor, I think the point is just how they would have been perceived by the district judge. And I think that's equally a plausible reading to saying everyone wanted to go higher, but someone persuaded them to go lower. So we'll go back to 151. And so I just want to point out to the court. I hear what you're saying, and let me just repeat this. So I think what you're saying is that at the very start of the hearing when the judge articulates some concern, the response to that from the AUSA is, look, there was a lot of discussion, and we reached the recommendation that we did. Is that a fair statement of what you're saying? Yes. And then later, after the defendant has an opportunity to request a downward departure, that's when the AUSA really goes into all this other stuff. But on page 77 of the ER, she again says in her office, and this is actually what causes the court to inquire further, and makes that same statement. It doesn't make sense. What you're saying doesn't entirely make sense factually because if the response to the judge's concerns about whether the sentence recommendation was high enough was, hey, look, we had a lot of conversation in the office, and we ultimately recommended this, then why say that again in response to the defendant's comments about requesting a downward departure for his physical limitations? Remember, I think precisely that reason, Your Honor, is that the defendant's attorney had just spoken, right? He had just made the pitch based not just primarily on the physical issues and the handicap, but also saying remorse, or this might have remorse. So he's using the same factual predicate that we had this conversation for two opposite purposes? So here's, I think, to me, the key language of what she was trying to do. I think what she was trying to do, exactly what Judge Christian mentioned earlier, was the balance. And I think she got off track, but if you look at this ER 77, right after she says, much discussion before the judge interjects with a follow-up question, she says, on the one hand, you have. And that was the start of, and I'll point out later on, after answering some judge questions, and after a point dealing with the aggravating circumstances in the bottom of 77, she finishes off saying multiple pounds, multiple years, we compare that. And then she left out two of the aggravators that were mentioned in the sentencing memo. She ticked through those quickly and then gets to, so we compare and contrast that. This is on 78. We can compare and contrast that to someone who has very significant and undeniable physical limitations and concerns. So was that model advocacy? Was that the model? I think we used the language in the First Circuit, a model of circumspection. No, I think those words that you made clear what she was trying to do was signal to the court, but the weight of the office behind the recommendation saying, we've done this down to the judge. This is the right sentence. And I think a plain error review where the defendant bears the burden of persuasion and the tie goes to us, I think certainly we should get the benefit of the record, the benefit of those inferences on plain error review. Can I ask you then about the comparison to murderers? And would there be any problem with our court clarifying in this case that if you're arguing for the low end of a range and it would be about ten years or so, you shouldn't be saying this is like a mass murder. If we were to make that rule today, you would still win if we say it wasn't clear before. Is there any problem with that? No, I think with the caveat that, you know, I view this as kind of a proportionality principle, right? I mean, so if you're caving to the facts of this case saying that wasn't necessary, and I think for our dialogue earlier on the standard of could this have any use other than pushing for a higher sentence, that in a context where the government is seeking ten years, thirteen years, whatever it is, those comments could easily be misconstrued. I guess the case I would avert to, Your Honor, is the Salazar case from the Seventh Circuit, the site in our brief where they would say, describe the defendant as a cold-blooded killer. And the Seventh Circuit said kind of close to the line, problematic because it could be misconstrued, but they would say paired that with the government's actual recommendation and didn't do things that would have been worse. Like making an eye at the judge, like saying, and by the way, judge, you're not bound by this recommendation. Or using some of the phrases other courts have found problematic, where the word prosecutor said, at a minimum, this would be appropriate, or put him away for as long as he can. The book, I think, adds some additional flair to this argument, but why would it be improper for the government to say this person was orchestrating a massive sale of drugs that are responsible for killing thousands of people across the United States and in this particular part of Washington? That seems like a legitimate argument. No, I do think it's a legitimate argument. I think my point is that we've argued this right. The plea agreement says that we gave truce names that are relevant to sentencing. This information, especially the CDC statistics and information about the effects on the community of these particular drugs, which is heroin, methamphetamine, and the book was a book about heroin and opioid addiction, I should say. But I understand the concern, in particular, to be about the Fifth Circuit case that I thought was some of Judge Freeland's concern here. And I will say this. I think the prosecutor was using that to make a rhetorical point. I think that, you know, there's a dissent in that case. If you really start digging into it and saying, well, what did she really mean? We should be thinking of this guy as worse than a mass murderer. Well, there was a dissenting judge who thought, this is unconstitutional. So, I mean, I think the prosecutor was using that as a shorthand rhetorical point and not trying to wink the nod and say, give this guy life. But it's not the facts. It's not the facts. It's the purpose for which the facts are being marshaled. And so the facts that Judge Fress has just indicated, right, express what was uncontested, this very serious conduct. That's true, Your Honor. But I guess the prosecutor at the time that she does write the memo doesn't know how the district court is going to perceive this information. I mean, some of the reasons we included it. You're reading in a hostility to my question. It's not like I'm agreeing with you. Right. Right. I'm just saying I think it's important to put yourself in the position of a prosecutor. And some of the questions from the bench, I think, have been helpful in recognizing that 151 months is a long sentence. In the Lessard case in the First Circuit we cited, where the prosecutor had a slip of the tongue there about requesting a big sentence, the First Circuit said, well, that's not really a problem because anyone would agree that a sentence at the bottom of a 135 to 151 range is a big sentence. The same is true of a 151-month sentence for a defendant who is 50 years old in criminal history category one and had, well, I would say, cringe-worthy physical ailments that I think induced sympathy in many people. And the prosecutor felt compelled, I think, to discuss those. You mentioned earlier that had there been a contemporaneous objection, we might have some findings from the judge. Might we not also have had some further comments from the prosecutor clarifying some of the questions we have about what exactly she meant by these arguments? You might. And I think Puckett also recognizes the importance of that point, Your Honor, by explaining that some breaches can be cured. I should be handed over to the court and say this court has been pretty strict about when breaches can be cured, so I don't want to suggest that in this particular case, if the court had felt like the district court had made findings and found breach and felt like the bell couldn't be unrung, maybe it still would have led to a resentencing before a different judge. But I do agree, Your Honor, Puckett itself says in some cases breaches can be cured, and he gives one example of where the prosecutor forgot about a recommendation. And so you can imagine a situation in which the probation office recommended the low end, the prosecutor forgot to make it, he or she is reminded of that, makes the recommendation, the judge gives the sentence, and maybe technically a breach, but cured, or was not cured, almost, because the court imposed the sentence anyway. Counsel, does it matter that the court reiterated verbatim, in some instances, the arguments that were made by the government? What do we do with that information? I think that matters if you reach the prejudice prong of the prong three, right? If you find that there was, in fact, an implicit breach of the plea agreement here at the first prong of plain error, if you find that that breach was clear and obvious under settled law, that's prong two, then you can turn to the question of whether the breach affected the defendant's substantial rights. And you're right, Your Honor, that especially in the Gonzales Aguilar case from this court, this court has looked to see whether the prosecutor's improper remarks influenced or affected the judge's sentence. But why couldn't we consider that in determining whether or not the error was plain? Because I think plain error usually depends on the state of the governing law. I mean, if the law precludes comments that would go outside the bounds of what the government has agreed to, and this infers that or implies that it did go outside because the court relied upon those comments, why couldn't we use that to determine that the error was plain? What's the gift to compare what the prosecutor's remarks were to what the boundaries set by this court's precedents in determining plain? And then I think once you do that, you find they're improper, then the place to consider the district court's reliance on them would be at the third prong. I don't agree. I think that we can look at that to see if the error was plain. If what happened here goes outside the bounds of what we have said is permissible in the law. Yeah, I agree with that, Your Honor, right, that, yes, you can certainly look at the boundaries in this court's cases and just compare the prosecutors. I would agree with that. But if I do turn, I'm happy to answer any questions the court has about the test we've proposed or. . . I have a question. You referenced the supplemental brief, page 7. There is a test that seems a little different on page 1 of your supplemental brief, which is that the argument can be understood in context only as supporting a harsher punishment. Is that the same formulation as you would do it? Yeah. I think, so, Your Honor, I think we are trying to capture there kind of the second, you know, the end-run principle from the case law. And so I think it's essentially what I said before about being reasonably consistent with the government's obligations. My concern with a standard that asks a little bit more unforgivingly, I guess I would say, about could anyone have understood the prosecutor's remarks to be pushing higher, I don't think it's the way to look at it, especially in a plain error review, right? To me, that is, if the prosecutor's remarks could be understood to serve a proper purpose, and here they could of responding to the defendant's argument, then that should carry the day. If there's two inferences that can be drawn from the government's argument, then you have to draw in favor of the government. I think so. And that's especially true on a plain error review, right, where the error has to be clear or obvious. Okay. Well, what about on just regular error review? I think the same is true. I would say the same is true. I think that we should be asking, you know, not drawing the most nefarious inferences. A lot of this comes, of course, against the backdrop of a presumption of regularity that officers are complying with, officers of the court are complying with their obligations. So I don't think the court should reach out to police rhetoric. There are extreme cases, as I acknowledged, in the response to Chief Judge Murdia's question, but I don't think this one breaches that bound, despite some of the rhetoric that's troubled members of the court. On the third point of the plain error test, I guess I wanted to address. Yes. Mr. Three, could I ask you what is the government's best argument that the error here was not plain? Our best argument that the error was not plain is that none of the court's cases prior to this point, none of the ones that I think was just mentioned, Mondragon, Whitney, Johnson, Heredia, involved a situation where the defendant was allowed to request leniency, and the prosecutor was arguing in response to that. So even if you think the Moshella is distinguishable for your dialogue, Judge Smith, with defense counsel, if you think it's distinguishable because the plea agreement here didn't have a specific clause that authorized the argument, you still end up thinking, what is the default rule in these cases? Where there's a delta the prosecutor has to cover? Why is my higher sentence justified and the defendant's not justified? If this court hadn't spoken to that scenario, the only out-of-circuit cases that I've seen from the First Circuit and the Tenth Circuit say the default rule is the prosecutor can respond within reasonable limits. But can the prosecutor respond in such a way as to elicit a sentence that is higher than the one that it had agreed to? That's the dilemma we have here, is whether or not that line was crossed. I think you've put your finger on it, Your Honor. That is the dilemma here. For the reasons we've been discussing before, I would say no, the prosecutor didn't cross that line. In terms of guidance going forward, I think the dialogue we had before about signposting, about making sure that the prosecutor is responsive, Judge Christians might have questioned earlier about sequencing. I think it is important to our case here, it may be not dispositive that the prosecutor's sentencing memo was in response to one filed 10 days earlier by the defendant. So you would agree that in a plea agreement like this one that allows the defendant to seek a downward departure and doesn't limit the prosecutor's response, the prosecutor can, in fact, respond, but there are limits. And that limit is that they can respond up to the agreed-upon sentence that the government recommended. They can, Your Honor, but I think the difficulty here, and this is a— I'm just asking about a general principle. General principle, yes. But the difficulty I think you run into is that the arguments that the prosecutors make in aggravation can conceivably, in some cases, also induce a higher sentence. And so it's hard to—that is a certain position that Taylor resides in. Well, that's true because the court has the discretion to sentence the defendant higher. But I guess the point that I'm trying to make, and by soliciting your response, that you agree with this general principle, is that the prosecutor then has an obligation to at least inform the court that they are recommending the sentence that was agreed upon in the plea agreement. So if they're staying true to the agreement, even if it ultimately results in the court sentencing the defendant to a higher sentence, that doesn't violate this rule, as long as the government has done what it needs to do to comply with the agreement. Yes, I agree with you, Your Honor. The idea, to me, is that the arguments the prosecutor is making in aggravation, they are serving a permissible purpose or permissible end under the plea agreement. Is the prosecution, in this case, tied its comments in with this recommendation and say, for these reasons, we stick with our recommendation rather than the lower sentence that the defendant is requesting? Is that anywhere in the record? The prosecutor didn't do it that way, and that's why I tried to acknowledge, Your Honor, that I think this would be an easier case for us, a stronger case for us, if she had done so. But I think context matters. And as I mentioned before, the sequence is important here. Defendant went first. And so the prosecutor referenced, in her sentencing memo, the defendant's significant physical ailments and tried to basically parry that and say, but that hasn't stopped him, right? He's had these ailments for many years. He's continued his bad. It was quite clear from context that that's what she was responding to. Coming out of the blue, that would have made no sense. Likewise, at the sentencing hearing, she didn't say, in response to the defense counsel's argument, we oppose a variance because. But it's quite clear that she was referencing the significant physical ailments and expressing the office's sympathy for them. The defense counsel had just spoken. It was quite clear from context what she was doing. It's not so clear that the prosecutor was sticking by the recommendation or the agreement that the prosecutor made for the sentence. That's not quite clear. In fact, I can just read one record, Your Honor. I do want to also make the point that while the prosecutor at the hearing did say it was a sense of memo, the sense of memo didn't just say hammer, hammer, hammer. It started out by making some of the mitigating motions and arguments the court is familiar with that are under seal, right? By, again, pushing for a reduction that raised the eyebrows of the district court, as Judge Christian put it. And then she said she recommended, based on the totality of circumstances, 151 months and five years of supervisory release, and says the United States respectfully submits that such a sentence would be sufficient but not greater than necessary to accomplish the goals of sentencing and achieve an appropriate balance of the 3553A factors. So she didn't just say, we recommend this. Let me hammer this guy. She gave an explanation, right? This is the balance we think is properly struck. And so, again, if she had read that back out of the sentencing hearing, would that have been a clearer compliance with the plea agreement? Yes. But it's a question of time. This is a question you raised earlier, the problem with appellate fact finding and the issue of the question of what much dissension meant in the office. So is your position that we don't have to determine what that actually means, that we can just rely that it has multiple inferences of what that means, and that the government's entitled to the inference in the light most favorable to it? Is that basically your argument? We don't need to know what that dissension really meant? It's that, Your Honor. I also think that just read in light of the record and the portion of the sealed proceeding I referenced here, I actually think the court can say that. I guess I should say this. I think the question is kind of how this would have landed in the district court. And because of the reasons that I gave before, based on the sealed portion of the transcript, I don't think that this would have landed as an argument for undermining the government's recommendation in the plea agreement. But you're asking us to make that factual finding, and how would we do that, under what standard? No, I don't think it's a factual finding. I guess if Your Honor is comfortable viewing this in terms of inferences to be drawn, it's saying because the record equally supports the inference that this discussion was being referenced to support the government's recommendation rather than undermine it, that's all you have to know. I think that would be sufficient to resolve this case, certainly. You made a statement that the government didn't cross the line here. Were you talking about the implied breach of the plea agreement, or were you talking about plain error? I couldn't tell. Both. I mean, on prong one of whether there was an error or whether this advocacy here rises to the level of implicit breach, we think the answer is no, while recognizing that some of the rhetoric was close to the line. I think, you know, under the understanding of the plea agreement, that has to be relevant to sentencing. For some of the reasons that Judge Brass and others were mentioning earlier, I do think it was relevant to sentencing to highlight the gravity and the seriousness of trafficking large quantities of heroin and methamphetamine, but I recognize the rhetoric used was close to the line. I mean, close to the line. And if it was disproportionate, that doesn't matter. I do think that matters, Your Honor, and I think, again, if the Court is trying to give guidance, that kind of proportionality principle makes sense. The kind of least or the leeway in our supplemental brief, because I think that that captures, hopefully, proportionality concept. If Mr. Vargas-Gutierrez had asked for a sentence one month lower than what the government was recommending, and the government responded with a barrage of aggravating information and didn't respond to mitigators and things like that, it makes this a much, much harder case for us, by far. So I think you have to think about, for lack of a better term, the delta, like the spread between what the defendant's asking for and what the government's asking for, and that helps answer the question I think Judge Christian was posing about purpose. Can these comments be construed as serving a valid purpose permitted under the plea agreement, justifying the government's recommended sentence and telling the Court that the much lower one the defendant is seeking is inappropriate? I have one minute left, Your Honor, and I'm happy to answer any questions. But on prong three, the Court hasn't really discussed that too much today. The federal defenders have a proposal in their amicus brief that the Court should essentially adopt a presumption of prejudice, as I understand it. And I just want to mention to the Court, of course, that's raised for the first time in the amicus brief filed after the close of the parties' briefing. So for that reason, I think the Court should not entertain it. And if it does, I would just try to preserve the point that I think the argument's inconsistent with Puckett. It would require the Court to significantly abrogate the Gonzales-Aguilar precedent from this Court, which considered a similar argument, and I don't think it's supported by the Fourth, Fifth, and Seventh Circuit cases the defenders have cited. All those cases involve situations not of implicit breach, but express breaches where the prosecutor recommended the wrong number, recommended the high end of the range when she promised to recommend the low end, or recommended something outside the guidelines range entirely above it. So it's a case of numerical problems, and the Court's worried about the anchoring effect that had, just like you see in guidelines cases. So, again, as a procedural matter, we think the Court should consider it on the merits. I think it's inconsistent with Supreme Court and Circuit precedent. Let me just ask, Judge Gould, do you have any questions here for Mr. Meisler? No.  Thank you, Your Honor. We'd ask that the Court affirm. Thank you. Mr. Hormel, you don't have any time, but I'll give you a minute. Could I just respond to Judge Smith's last question to Amity? Sure. The defendant, Mr. Farias, did not seek a petition for invoke here. It was actually opposed when the order came out asking for our positions. And I believe you asked Amity why we asked for a rehearing invoke, and that actually came from the Court. Thank you. Ms. Baraka, I'll also give you a minute. I'd like to try to make three quick points. And first, that this line we're talking about doesn't change whether or not it's on plain air or preserved air. The line stays the same. And in this case, the government crossed that line. And it's not like even on plain air that we need a qualified immunity case where we have to show a case with exact same facts. It's whether or not there's a clear legal principle. And I think the parties here have agreed on the clear legal principle that we're going after. And I think one thing that the government cited, the Salazar case, and I think that is important because that is their best case that there's a crossing or that they didn't cross the line here because that conduct in Salazar. But if you look at that case, that circuit did say how close of a line it was. And if you compare what the government did in Salazar, one stray comment, to the body of work that the government did here, it is further crossing the line. It actually went way across. The last point I'd like to make is more of a practical one. If this court affirms the conduct of the government here, they have essentially rendered the low-end recommendation illusory. There will be no way incentive for us to enter an agreement for a low-end if the government can make these type of arguments against the low-end recommendation. If you plan on not paying attention during the hearing, right? Because if you objected, we wouldn't have this issue, right? Well, the conduct is still improper whether or not we object or not. The failure of us to object doesn't mean the government didn't cross the line. Yes, it makes it harder for us to prevail on appeal, but it doesn't make their conduct right. And that's the thing. We would have to imagine the conversations we'd have with our clients of, you know, the government was agreed to recommend low-end. All they have to do is say low-end. But if we ask for, you know, a month or anything lower, they can say whatever they want. They can compare you to a murderer. They can talk about it as a practical matter. Objection is going to prompt some clarification from them of what they're arguing, right? That's either going to put it clearly over the line or they're going to back away and say, no, no, no, we really didn't mean that. Like, sorry, we stick by the low end, right? That's not what's going to happen. Right, but I think it's even more important for this court to say this conduct draws the line. So defense attorneys will know they can object, but particularly so prosecutors won't know to cross this line in this way. Thank you. Let me ask, do you have any questions for Mr. Bronco or Mr. Hormel? No questions for me. Thank you. All right. Well, thank you very much. The case of the United States of America versus Fernando Arias Contreras is submitted. Mr. Hormel, Mr. Bronco, Mr. Mizer, thank you for your argument presentations here today. We are adjourned. All rise. This court for this session stands adjourned.
judges: MURGUIA, GOULD, RAWLINSON, SMITH, CHRISTEN, FRIEDLAND, BENNETT, MILLER, BRESS, BUMATAY, DESAI